# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

JOHN H. SMITH, JR.,          )
                                 )
      Petitioner,       )
                                 )
   vs.                  )        **Case No. 4:08CV1529MLM**
                                 )
DON ROPER,              )
                                 )
      Respondent.   )

## <u>MEMORANDUM OPINION</u>

Before the court is the Petition Under 28 U.S.C. § 2254 by a Person in State Custody and Amended Petition filed by Petitioner John H. Smith ("Petitioner").[1] Doc. 1, Doc. 7, Doc. 11, Doc. 17. Respondent Don Roper filed a Response to the Order to Show Cause Why a Writ of Habeas Corpus Should Not Be Granted. Doc. 9. Petitioner filed a Traverse. Doc. 25. Also before the court is the Motion to Reconsider filed by Petitioner. Doc. 27. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 5.

## I.
## BACKGROUND

On September 1, 2004, Petitioner was charged by Information in Lieu of Indictment as follows: Count I, the class A felony of murder in the first degree, in that between Tuesday, October 1, 2002, at approximately 11:00 p.m., and Wednesday, October 2, 2002, at approximately 1:17 a.m.,

---

[1]      On December 23, 2008, Petitioner filed a Motion to Amend, to which he attached an amended petition. On December 29, 2008, by docket text order, the court granted Petitioner's Motion to Amend. Petitioner filed an Amended Petition on February 2, 2009, in which he included the same grounds for relief stated in the original Petition and in the proposed amended petition attached to the Motion to Amend. Respondent filed a Response to Order to Show Cause on January 21, 2009, in which Respondent addressed all grounds for relief raised by Petitioner. Doc. 9.

at 3025 Nordic, in St. Louis County, Petitioner and Bryan Smith, acting together, after deliberation, knowingly caused the death of Subrenia M. Smith by shooting her; Count II, the unclassified felony of armed criminal action in regard to Count I; Count III, the class D felony of hindering prosecution, in that on or about Wednesday, October 2, 2003, in St. Louis County, Petitioner and Bryan Smith, acting together, for the purpose of preventing the prosecution of Petitioner for conduct constituting the crime of murder in the first degree as alleged in Count I, obstructed, by means of deception, Lt. Adams from performing an act that might aid in the apprehension of Petitioner, by falsely reporting that Petitioner and Subrenia Smith were victims of a burglary; Count IV, the class D felony of tampering with physical evidence, in that Petitioner and Bryan Smith, between Tuesday, October 1, 2002, at approximately 11:00 p.m., and Wednesday, October 2, 2002, at approximately 1:17 a.m., in St. Louis County, acting together, concealed a firearm, a silencer, and clothing with the purpose to impair its availability in an official investigation, and thereby impaired and obstructed the prosecution of Petitioner for the crime of murder in the first degree; and Count V, the class C felony of a unlawful possession of a firearm silencer, in that between Tuesday, October 1, 2002, at approximately 11:00 p.m., and Wednesday, October 2, 2002, at approximately 1:17 a.m., in St. Louis County, Petitioner and Bryan Smith, acting together, knowingly possessed a firearm silencer. Resp. Ex. B at 10-13.

The testimony at Petitioner's trial was as follows: In October 2002 Petitioner was married to Subrenia Smith[2]; the couple had two sons; Petitioner occasionally worked as a truck driver and also operated a commercial cleaning company; Subrenia had an affair with Tracy Gayden, a co-worker at the Department of Veteran's Affairs; Petitioner called Gayden in June of 2002 and told Gayden to

---

[2]        The Missouri appellate court referred to Ms. Smith as "Subrenia," noting that it did so meaning no disrespect.  This court will do likewise.

2

stop seeing his wife; the affair ended after that phone call; Petitioner called Gayden a second time and demanded that he stop seeing Subrenia; Gayden told Petitioner that he was not seeing Subrenia outside of work; Gayden had the impression that Petitioner did not believe him; Petitioner complained to his friend, Bryan "Propane" Smith[3]; Propane told Petitioner that he would be willing to kill Subrenia if Petitioner wanted him to do so; and Propane also told Petitioner that he had looked-up information in the computer on ways to make a silencer. Resp. Ex. , Tr. 351-57, 581-90, 727-30.

Additionally, there was testimony that there were indications that Subrenia might have been making plans to leave Petitioner including that her cubicle at work contained an apartment guide to the greater St. Louis metropolitan area, dated July 2002; that the cubicle also contained an employee assistance program brochure on marital and relationship concerns; and that, at her house, a cardboard box was filled with picture frames and miscellaneous items, a suitcase was filled with crystal stemware and candlestick holders, and a tupperware bin was filled with women's clothing. Tr. 381-90.

Further, there was testimony that at around midnight on October 2, 2004, Propane was at a music studio with a man named Ben Monroe; that at about 12:09 a.m., Monroe received a call on his cell phone from Petitioner, who asked to speak to Propane; that Propane spoke with Petitioner and told Monroe he was going over to Petitioner's house; that Propane left the studio between 12:15 and 12:20 a.m. and when he arrived at Petitioner's house and the two men went to the basement; that Petitioner called upstairs to Subrenia and asked her to come downstairs; that Subrenia came down to the basement and was hit in the face and then shot in the head; that the gunshot to the head killed her; that Petitioner and Propane then tried to stage the scene to make it appear as though

---

[3] The Missouri appellate court referred to Bryan "Propane" Smith as "Propane." This court will do likewise.

Subrenia's death had been caused by burglars; that Propane hit Petitioner in the face and shot him in the leg and the arm; that Propane returned to Monroe's studio between 1:00 and 1:20 a.m.; that Propane had brought Monroe to the studio earlier in the day and was to give Monroe a ride home; that Propane went to his truck, where he was going to wait while Monroe finished closing down the studio; that when Monroe went outside, Propane was gone; and that he returned about ten minutes later. Tr. 324-25, 318-22, 584-88, 677-80.

Further, there was testimony that Petitioner called 911 at 1:11 a.m.; that Petitioner told the 911 operator that someone had broken into his home and that he was in the basement; that Petitioner did not provide any other information to the 911 operator; that Petitioner placed a second call to 911 at 1:15 a.m.; that Petitioner initially told the 911 operator that his back hurt and that his wife and children were in the house; and that later in the 911 call, Petitioner stated that he had just been shot, that he had turned off the light because he heard something, that he was unable to go up the steps, and that responding police officers could enter the house through a back door into the basement. Tr. 209-14.

Officers testified that, upon arriving at the scene, they observed lights on in the house and a car parked in the driveway; that the officers went to the back of the house and found the outer door standing completely open, with the inner door partially open; that some glass had been broken in the outer door; that it did not appear to the investigating officers that a person would have been able to reach through that hole and unlock the inner door; that the officers entered the basement, which was brightly lit; that Petitioner was lying on the floor near a couch and Subrenia was lying on the ground on the other side of the basement; that one of the officers checked Subrenia and found no pulse; that Petitioner said that he heard a noise in the basement and encountered a black male when he went down to investigate and that he was then hit on the back of the head and did not

4

remember anything after that; that Petitioner had a very calm demeanor as he talked to police; that an officer who went upstairs to check on the boys found them asleep in their bedroom; that a television set was on in the boys' room and the volume was turned-up to a high level; that the officer tried to awaken the boys, and had a hard time doing so; and that police officers later seized several partially-used packages of decongestants, sleep aids, pain medication, and cold medications. Tr. 218-20, 240-446, 368-71.

Witnesses also testified that Petitioner was taken to a hospital, where he was treated for minor gunshot wounds to the leg and the arm and a minor abrasion to his lip; that the doctor who treated Petitioner at the hospital told police that Petitioner did not have a head or back injury; and that a police officer interviewed Petitioner at the hospital. Witness testimony was that Petitioner told the police officer that he heard a noise in the basement and went to investigate; that he was punched when he got to the bottom of the stairwell; that he began fighting with a black male wearing a black-hooded sweatshirt and jean shorts and with another person that he could not identify; that as he fought with the two men, he called out to his wife; that the man wearing the hooded sweatshirt and the shorts told his companion to shoot Petitioner; that Petitioner then heard a popping sound and felt pain in his leg. The officer testified that Petitioner did not say anything to the officer about Propane being at his house; that Petitioner's demeanor during the interview at the hospital was calm and deliberate, and he appeared alert and not under the influence of any medications; that Petitioner did not inquire about the condition of his wife or children; that after being informed that his wife had been killed, Petitioner began crying shallowly; and that it "wasn't like hard crying" with "tears really emitting from his eyes." Tr. 267-78.

Officers testified that Petitioner was again interviewed about two hours later; that Petitioner then told officers that he arrived home between 10:00 p.m. and 11:09 p.m.; that Petitioner repeated

his story about fighting with two men in the basement and being shot by one of the men; that Petitioner said that the men hit and kicked him after he had been shot and that he was hit in the back with a bat; that Petitioner said that the last time he had seen Propane was between 4:00 p.m. and 6:00 p.m. that evening; that the officers then confronted Petitioner with the information that they had interviewed Propane and Benjamin Monroe, and had learned that Propane had been at Petitioner's house at 12:30 a.m.; that Petitioner responded that he had been talking on the phone with Propane when he returned home at 11:09 p.m., and had asked him to come over; that Petitioner said that Propane arrived 20 to 30 minutes later and left at around midnight; and that phone records showed a call from Petitioner's phone to his father at 11:07 p.m. and that the next call made after that was at 12:07 a.m., and was placed to Monroe's studio. Tr. 526-42.

Evidence presented and testimony at Petitioner's trial was that a shell casing was recovered from the floor of the basement; that three bullets were found in a pillow that was on a couch in the basement; that a search of Propane's house led to the discovery of a .22 caliber cartridge box, a black metal pipe with several holes in it, and two plastic two-liter bottles with the bottom halves cut off; that an eyeglass case in which there was .22 caliber ammunition was found in a crawl space of the house; that a bag containing electrical tape used to fasten the silencer to the gun, paper towels, and a bath-type hand towel were found inside a trash can; that a roll of the same type of paper towels was found at Petitioner's house; that when Propane's computer was searched, it was determined that a document called the Anarchist Cookbook had been downloaded onto the computer on August 20, 2002, and had been deleted sometime between that date and October 2, 2002; that the Anarchist Cookbook contained instructions on how to make a silencer; that Propane led police to a location in the City of St. Louis where a modified rifle had been hidden in a sewer; that a shell casing was found inside the weapon, indicating it had been fired; and that Propane also took the police to a

dumpster near Benjamin Monroe's studio and pointed out a plastic bag containing a tee shirt and underwear; that DNA tests matched a blood stain on the t-shirt to Petitioner; that blood stains found on a boxing glove recovered from the basement were matched to Subrenia; that a bullet recovered from Subrenia was determined to have been fired from the rifle recovered from the sewer; that the bullets recovered from the floor of Petitioner's basement and the pillow in the basement, as well as the shell casings found in the eyeglass case at Propane's house were also determined to have been fired from that rifle; that the towel recovered from a trash can at Propane's house had gunshot residue; that a firearms expert had replicated the homemade silencer recovered from Propane's house and test-fired the device using the rifle recovered from the sewer; and that the towel that the expert draped over the silencer when he test-fired the gun showed a residue pattern similar to that found on the towel recovered from Propane's trash can. Tr. 373, 420-423, 437-42, 450-51, 487-89, 505, 516, 518, 644, 648, 656, 695-96, 702-16.

Petitioner was arrested at a Denny's restaurant on the morning of October 5, 2002. Officers testified that after being given Miranda rights at the police station and after signing a waiver, upon being told by police that they had recovered more evidence, Petitioner stated, "I'm fucked, I never get a break"; that Petitioner denied hitting Subrenia and would not say who did; that Petitioner refused to say who shot Subrenia; that Petitioner did state at one point that he was responsible for Subrenia's death and that Propane was responsible for taking the gun and other items out of the house; and that Petitioner said Subrenia's death had to happen "because of the bitching, the cheating, and money." Tr. 497-98, 563-70, 585.

Petitioner testified at trial and said that he was attacked by burglars when he went to investigate a noise in the basement and that Propane was at his house between 3:00 p.m. and 5:00 p.m. on October 1 and did not return that day or the following morning. Tr. 732-40. At the end of

evidence, argument, and instructions, the jury returned a verdict finding Petitioner guilty on all counts. Tr. 879-80; Resp. Ex. at 5, 53-54. Petitioner waived jury sentencing in exchange for an agreement that he would receive the maximum sentence on each charge, with the sentences to run concurrent with one another. Tr. 883-85.

On January 18, 2006, Petitioner filed a direct appeal. Resp. Ex. C. On May 2, 2006, the Missouri appellate court affirmed the judgment against Petitioner and issued the mandate on July 13, 2006. Resp. Ex. E, Ex. F. Petitioner filed a post-conviction relief motion. Resp. Ex. G at 3-31. Counsel was appointed and filed an amended motion. Resp. Ex. G at 39-63. The motion court denied Petitioner post-conviction relief. Resp. Ex. G at 69-79. On November 27, 2007, Petitioner filed an appeal of the motion court's decision with the Missouri appellate court. Resp. Ex. H. On April 21, 2008, the Missouri appellate court affirmed the decision of the motion court and issued the mandate on August 28, 2008. Resp. Ex. J, Ex. K. On October 3, 2008, Petitioner filed the his § 2254 Amended Petition in which he raises the following issues:

> (1) The trial court erred by barring Petitioner from cross-examining a police officer about information concerning a deal that Bryan "Propane" Smith made with the prosecutor;

> (2) The trial court erred in sustaining the State's objection to the closing argument of Petitioner's attorney when his attorney sought to draw an adverse inference from the fact that the State did not call Propane as a witness;

> (3) The trial court erred in allowing the prosecutor to argue in rebuttal that Propane would have his day in court and that the State occasionally made deals with criminals in order to catch and convict more dangerous criminals;

> (4) Petitioner's confession was improperly admitted into evidence because it was coerced;

> (5) The trial court erred in failing to sustain Petitioner's objection to testimony that Petitioner had guns in his house;

> (6) Petitioner received ineffective assistance of counsel because counsel failed to call Propane as a witness;

(7)      Petitioner received ineffective assistance of counsel because counsel failed to call the prosecutor as a witness to testify about the deal that the State made with Propane;

(8)      Petitioner received ineffective assistance of counsel because counsel failed to call A.J. Smith to testify about Petitioner's alibi on the night of the crime;

(9)      Petitioner received ineffective assistance of counsel because counsel failed to introduce into evidence Petitioner's medical records detailing his gunshot wounds;

(10)      Petitioner received ineffective assistance of counsel because counsel failed to call Petitioner as a witness at the suppression hearing;

(11)      Petitioner received ineffective assistance of counsel because counsel failed to argue in the motion for new trial that juror #12 was sleeping during trial;

(12)      Petitioner received ineffective assistance of counsel because counsel failed to investigate an allegation that juror #12 was acquainted with Paula Whitehorn, a friend of Petitioner's, and may have discussed the case with Whitehorn during the trial;

(13)      Petitioner received ineffective assistance of counsel because counsel failed to file a motion to suppress illegally obtained evidence;

(14)      Petitioner received ineffective assistance of counsel because direct appeal counsel failed to argue that the trial court erred in sustaining the State's objection to Petitioner's medical records;

(15)      The police failed to disclose that they stole $43,000 from Petitioner's house;

(16)      The police conducted an unlawful search of Petitioner's property and unlawfully seized two vehicles.

(17)      Petitioner received ineffective assistance of counsel because "trial counsel intentionally failed to investigate outrageous police misconduct and prosecutorial misconduct, nor did he disclose the misconduct to [ ] Petitioner." The alleged misconduct involved police seizing approximately $43,000 from Petitioner's residence and the prosecutor's withholding evidence regarding the $43,000.

Doc. 1, Doc. 7, Doc. 11; Doc. 17. [4]

---

[4]      Document 7 is Petitioner's motion to amend, which includes Grounds 15 and 16; Document 11 is Petitioner's Amended Petition, which includes all grounds of the original Petition as well as Grounds 15 and 16; and Document 17 is Petitioner's second motion to amend which states

# III.
## EXHAUSTION, PROCEDURAL DEFAULT AND TIMELINESS ANALYSIS

To preserve issues for federal habeas review, a state prisoner must fairly present his or her claims to state courts during direct appeal or in post-conviction proceedings. Sweet v. Delo, 125 F.3d 1144, 1149 (8th Cir. 1997). Failure to raise a claim in a post-conviction appeal is an abandonment of a claim. Id. at 1150 (citing Reese v. Delo, 94 F.3d 1177, 1181 (8th Cir. 1996)). A state prisoner who fails "'to follow applicable state procedural rules [for] raising the claims' (citation omitted) . . . , is procedurally barred from raising them in a federal habeas action, regardless of whether he has exhausted his state-court remedies." Id. at 1151 (citing Coleman v. Thompson, 501 U.S. 722, 731-32 (1991)). "[A] prisoner must 'fairly present' not only the facts, but also the substance of his federal habeas corpus claim." Abdullah v. Groose, 75 F.3d 408, 411 (8th Cir. 1996) (en banc) (citation omitted). "[F]airly present" means that state prisoners are "required to 'refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue.'" Id. at 411-12. A state-law claim which is raised in state court which "is merely similar to the federal habeas claim is insufficient to satisfy the fairly presented requirement." Id. at 412.

The United States Supreme Court holds that a state prisoner can overcome procedural default if he or she can demonstrate cause and prejudice for the procedural default. Dretke v. Haley, 541 U.S. 386, 388-89 (2004). See also Coleman, 501 U.S. at 750 (holding that a state habeas petitioner can overcome procedural default by demonstrating cause for the default and actual prejudice or demonstrate that default will result in a fundamental miscarriage-of-justice; Battle v. Delo, 19 F.3d 1547, 1552 (8th Cir. 1994). The United States Supreme Court has recently held that

---

Ground 17.

because the "cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice" the Court has "recognized a narrow exception to the cause requirement where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." Dretke, 541 U.S. at 393 (citing Murray v. Carrier, 477 U.S. 478, 496 (1986); Schlup v. Delo, 513 U.S. 298 (1995)). "[A] habeas petitioner who wishes to have a procedurally defaulted claim evaluated on its merits 'must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner [guilty] under the applicable state law.'" McCoy v. Lockhart, 969 F.2d 649, 651 (8th Cir. 1992 ) (citation omitted). Actual innocence is required to meet the miscarriage-of-justice exception. See Sweet, 125 F.3d at 1152 (citing Schlup, 513 U.S. at 316). The Supreme Court, however, has limited the application of the actual innocence exception to the capital sentencing context. See Dretke, 541 U.S. at 393. In Dretke, the Court declined to extend the actual innocence exception to procedural default of constitutional claims challenging noncapital sentencing error. Rather, the Court held "that a federal court faced with allegations of actual innocence, whether of the sentence or of the crime charged, must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default." Id. at 393-94.

It has been held that "novel circumstances and arguments" may constitute cause to excuse procedural default. McKinnon v. Lockhart, 921 F.2d 830, 833-34 (8th Cir. 1990). "[T]he Supreme Court [has] recognized that cause may exist when the claim raised is so novel that there was no reasonable basis to have asserted it at the time of a petitioner's state appeals." Id. at 833(citing Reed v. Ross, 468 U.S. 1, 16 (1984)). However, "[if] the 'tools were available' for a petitioner to construct the legal argument at the time of the state appeals process, then the claim cannot be said

to be so novel as to constitute cause for failing to raise it earlier." Id. (citing Leggins v. Lockhart, 822 F.2d 764, 766 (8th Cir.1987)).

In regard to the "prejudice" component of "cause and prejudice," as discussed above, "actual prejudice" is required to overcome the procedural bar. Zinzer v. Iowa, 60 F.3d 1296, 1299 (8th Cir. 1995). "Prejudice, within the meaning of [the ineffective assistance of counsel standard of Strickland v. Washington, 466 U.S. 668 (1984)] occurs when appellate counsel's deficient performance renders the result of the direct appeal unreliable or fundamentally unfair." Id. The Eighth Circuit, however, holds that the "'prejudice' component of 'cause and prejudice' [necessary to excuse procedural default] is analytically distinct from the Strickland prejudice." Id. at 1299 n.7. The "'actual prejudice' required to overcome the procedural bar  must be a higher standard than the Strickland prejudice required to establish the underlying claim for ineffective assistance of counsel." Id. (citing United States v. Frady, 456 U.S. 152, 165-68 (1982) (holding that to obtain habeas relief on a defaulted claim, a petitioner must clear a significantly higher hurdle than would exist on direct appeal).

Prior to considering the merits of a state petitioner's habeas claim, a federal court must determine whether the federal constitutional dimensions of the petitioner's claims were fairly presented to the state court. Smittie v. Lockhart, 843 F.2d 295, 296 (8th Cir. 1988). "If not, the federal court must determine if the exhaustion requirement has nonetheless been met because there are no 'currently available, non-futile remedies,' through which the petitioner can present his claim." Id. (citation omitted).

In regard to the exhaustion requirement the Eighth Circuit holds:

"[I]t is well settled that only after some clear manifestation on the record that a state court will refuse to entertain petitioner's claims will the exhaustion requirement be disregarded as futile." Powell v. Wyrick, 657 F.2d 222, 224 (8th Cir.1981); accord Eaton v. Wyrick, 528 F.2d 477, 482 (8th Cir.1975). The question is usually

whether state law provides any presently available state procedure for determining the merits of the petitioner's claim; not whether the state court would decide in favor of the petitioner on the merits. See, e.g., Lindner v. Wyrick, 644 F.2d 724, 727 (8th Cir.), cert. denied, 454 U.S. 872, 102 S.Ct. 345, 70 L.Ed.2d 178 (1981) (return to state court not futile because Missouri rule allows second post-conviction petition if the petitioner can show his claims are based on information not available at the time of the first petition); Thomas v. Wyrick, 622 F.2d 411, 414 (8th Cir.1980) (whether state rule barring claims not raised in direct appeal makes post-conviction remedy presently unavailable is a question of state law).

Snethen v. Nix, 736 F.2d 1241, 1245 (8th Cir. 1984).

Additionally, § 2244(d)(1) establishes a 1-year limitation period on petitions filed pursuant to § 2254.

First, upon previously denying Petitioner's request to stay this matter pending exhaustion of his State remedies, the court found that Petitioner failed to exhaust his State remedies in regard to the issues of Grounds 15, 16, and 17 and that he has not shown good cause for his failure to exhaust. Doc. 16, Doc. 21. Additionally, the court informed Petitioner that his options included proceedings with his Amended Petition as filed or withdrawing the unexhausted claims and refiling upon exhaustion. The court advised Petitioner that if he did not withdraw the unexhausted claims by the date his Reply to the Response to the Order to Show Cause was due, the court would proceed to address his Amended Petition in its entirety. Petitioner has failed to withdraw his unexhausted claims. As such, the court finds that Petitioner has failed to exhaust his State remedies in regard to Grounds 15, 16, and 17 and that, therefore Grounds 15, 16, and 17 should be dismissed as unexhausted.

Second, the court has previously found that Petitioner did not raise the issues of Grounds 12-17 before the Missouri appellate court and he has, therefore, procedurally defaulted Grounds 12-

17. Doc. 16, Doc. 18.[5]  In his Traverse Petitioner argues that his procedural default of these Grounds should be excused.  To the extent that Petitioner contends that his procedural default of Grounds 15 and 16 should be excused because he was not made aware of the factual basis for Grounds 15 and 16 prior to the time he filed a direct appeal and/or the appeal of the denial of his post-conviction relief motion, the court has previously found that the record, including Petitioner's admissions in his original § 2254 Petition belie this assertion. Doc. 16 at 4-5.  In his Traverse Petitioner argues that he "has done all that he could do to put his claims before the state courts"; that he raised Grounds 12-14 before the Missouri courts, although not before the appellate court; and that, therefore, he did not procedurally default Grounds 12-14. Doc. 25 at 19.  In regard to Grounds 15-17, which address Petitioner's allegation that the police seized and failed to account for $43,000 and a vehicle from Petitioner's residence, Petitioner agues in his Traverse that he previously believed that his property was accounted for and that good cause to excuse procedural default is established by newly discovered evidence that his property was taken by police. Doc. 25 at 20-21.  As previously noted by this court, the record reflects that at the time of trial Petitioner knew that $43,000 was missing from his home; that two vehicles had been taken from his driveway; and that police would not return a vehicle to him. Doc. 16 at 5.  As such Petitioner knew the factual basis for Grounds 15-17 at a time when he could have properly raised them before the Missouri appellate court.  As such, the court finds that Petitioner has not suggested grounds to excuse his procedural default of Grounds 12-17.  The court further finds that Petitioner has not stated cause or prejudice to excuse his procedural default of Grounds 12-17 and that, therefore, Grounds 12-17 should be

---

[5]        Petitioner argued before the Missouri appellate court that the trial court erred in refusing to give a curative instruction in regard to testimony that he had firearms and ammunition in his home.  In Petitioner's Ground 5 he argues that the trial court erred in failing to sustain his objection to testimony that he had the firearms and ammunition.  In the interests of justice, the court will address Ground 5 on its merits.

denied on the basis that they are procedurally defaulted. See Dretke, 541 U.S. at 388-89; Coleman, 501 U.S. at 750. The court further finds that Petitioner's 2254 Amended Petition is timely.[6]

### III.
### STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"), applies to all petitions for habeas relief filed by state prisoners after this statute's effective date of April 24, 1996. Lindh v. Murphy, 521 U.S. 320, 326-29 (1997). In conducting habeas review pursuant to § 2254 a federal court is limited to deciding whether decisions of state courts were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). "'Federal law, as determined by the Supreme Court,' refers to 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" Evenstad v. Carlson, 470 F.3d 777, 782-83 (8th Cir. 2006) (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)). To obtain habeas relief, a habeas petitioner must be able to point to the Supreme Court precedent he thinks the state courts acted contrary to or applied unreasonably. Id. at 283 (citing Buchheit v. Norris, 459 F.3d 849, 853 (8th Cir. 2006); Owsley v. Bowersox, 234 F.3d 1055, 1057 (8th Cir. 2000)). Thus, where there is no federal law on a point raised by a habeas petitioner, a federal court cannot conclude either that a state court decision is "'contrary to, or involved an unreasonable application of, clearly established Federal law' under 28 U.S.C. §2254(d)(1)." Id. at 784. "When federal circuits disagree as to a point of law, the law cannot be considered 'clearly established' under 28 U.S.C. § 2254(d)(1). Id. at 783 (citing Tunstall v. Hopkins, 306 F.3d 601, 611 (8th Cir. 2002)). See also Carter v. Kemna, 255 F.3d 589, 592 (8th Cir. 2001)

---

[6]    While Petitioner filed amendments to his § 2254 Petition, the court notes that the amended grounds for relief were filed within the 1-year statutory period.

(holding that in the absence of controlling Supreme Court precedent, a federal court cannot reverse a state court decision even though it believes the state court's decision is "possibly incorrect").

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the United States Supreme Court set forth the requirements for federal courts to grant writs of habeas corpus to state prisoners under § 2254. The Court held that "§2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for writ of habeas corpus with respect to claims adjudicated on the merits in the state court." <u>Id.</u> at 412. The Court further held that the writ of habeas corpus may issue only if the state-court adjudication resulted in a decision that:

> (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal Law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Williams</u>, 529 U.S. at 412-13.

The Court further explained in <u>Williams</u> that for a state-court decision to satisfy the "contrary to" prong of § 2254(d)(1), the state court must apply a rule that "contradicts the governing law as set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent." 529 U.S. at 406. For a state-court decision to satisfy the "unreasonable application" prong of § 2254(d)(1), the state court decision must "identif[y] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably appl[y] that principle to the facts of [a] prisoner's case." <u>Williams</u>, 529 U.S. at 413.

Additionally, § 2254(d)(2) provides that an application for writ of habeas corpus should not be granted unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." Further, pursuant to § 2254(e)(1), "[a] state court's determination on the merits of a factual issue is entitled to a presumption of correctness." Boyd v. Minnesota, 274 F.3d 497, 500 (8th Cir. 2001). The state court's factual determinations "must be rebutted by clear and convincing evidence." King v. Kemna, 266 F.3d 816, 822 (8th Cir. 2001). For purposes of federal habeas relief, the state court decision involves an unreasonable determination of the facts in light of the evidence presented in state court proceedings "only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record." Lomholt v. Iowa, 327 F.3d 748, 752 (8th Cir. 2003). See also Jones v. Luebbers, 359 F.3d 1005, 1011 (8th Cir. 2004).

### III.
### STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

Federal law provides that to prove ineffective assistance of counsel, a habeas petitioner must show that: "(1) his counsel so grievously erred as to not function as the counsel guaranteed by the Sixth Amendment; and (2) his counsel's deficient performance prejudiced his defense." Auman v. United States, 67 F.3d 157, 162 (8th Cir. 1995) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). The "performance" prong of Strickland requires a showing that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. To overcome this presumption, a petitioner must prove that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id.

Even if a petitioner satisfies the performance component of the analysis, he is not entitled to relief unless he can prove sufficient prejudice. Id. at 697. To do so, a petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 669. The court is not required to "address both components of the [effective assistance of counsel] inquiry if [a petitioner] makes an insufficient showing on one [component]." Id. at 697.

Additionally, the court notes that the Court stated in Strickland, 466 U.S. at 688-89, that:

In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in the American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. (citation omitted). ...

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. (citation omitted). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." (citation omitted). There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. (citation omitted).

**IV.**
**DISCUSSION**

**Ground 1 -The trial court erred by barring Petitioner from cross-examining a police officer about information concerning a deal that Bryan "Propane" Smith made with the prosecutor:**

At Petitioner's trial defense counsel elicited testimony from police officers, on cross examination, that after the murder Propane contacted an attorney; that Propane's attorney contacted the police and arranged a meeting; that officers met with Propane at his lawyer's office prior to his leading them to particular locations; and that Propane had not been booked by police. Tr. 293, 296-303, 458, 460-63. When defense counsel asked the officers if "an understanding" had been reached between them at the meeting with Propane and his lawyer, the State objected and the court sustained the State's objections. Tr. 462-69.

Petitioner argues that "although Propane's word-for-word statements were not admitted into evidence, the very nature of his actions and the evidence he provided, were clearly accusatory." Petitioner contends that the trial court's failing to permit Petitioner's counsel from cross-examining the police officer regarding Propane's statements violated Petitioner's right to confront a witness against him. Petitioner also contends that the trial court improperly applied the hearsay rule. Doc. 25 at 3-4.

Upon addressing the issue of Petitioner's Ground 1, the Missouri appellate court first considered that Petitioner alleged that the trial court's preventing him from presenting evidence of Propane's deal with the State deprived him of his right to present a defense because it shed light on Propane's motivation to cooperate with the police. The Missouri appellate court further considered that "[i]t is within the trial court's discretion to control the scope of cross-examination" and that a "defendant is given 'an opportunity for effective cross-examination, [but] not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Resp. Ex. E at 3

19

(citing State v. Langston, 889 S.W.2d 93, 98 (Mo. Ct. App. 1994; State v. Dunn, 817, S.W.2d 241, 244 (Mo. 1991) (en banc)). Additionally, the court considered that "[q]uestions to a law enforcement officer regarding the State's arrangement with an informant or the officer's prior dealings with an informant are ... usually irrelevant and properly excluded." Resp. Ex. E at 3 (quoting State v. Rollie, 962 S.W.3d 412, 417 (Mo. Ct. App. 1997).

The Missouri appellate court also considered that evidence was presented that Propane accompanied police to various locations and was never arrested. The court concluded that Petitioner presented "no argument to persuade [the court] that the trial court abused its discretion in excluding testimony regarding the State's arrangement with Propane. Resp. Ex. E at 3.

Pursuant to Williams, the court will consider federal law applicable to Petitioner's Ground 1. "The Confrontation Clause of the Sixth Amendment guarantees to a defendant the opportunity for effective cross-examination of witnesses against him, including inquiry into the witnesses' motivation and bias." United States v. Willis, 997 F.2d 407, 415 (8th Cir. 1993). This guarantee, however, is not without limitation; a "trial judge must retain discretion to limit the scope of cross-examination." United States v. Wood, 834 F.2d 1382, 1384 (8th Cir.1987)[7] (citations omitted). See also United States v. Juvenile NB, 59 F.3d 771, 778 (8th Cir.1995). Reversal of a district court's decision to limit cross-examination is warranted, therefore, "only where there has been clear abuse of discretion, and a showing of prejudice to the defendant." Wood, 834 F.2d at 1384.

The United States Supreme Court held in Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986), as follows:

---

[7] United States v. Wood, 834 F.2d 1382, 1384 (8th Cir. 1987), was abrogated on other grounds by Aguayo-Delgado, 220 F.3d 926 (8th Cir. 2000).

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, <u>Pointer v. Texas</u>, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), "means more than being allowed to confront the witness physically." <u>Davis v. Alaska</u>, 415 U.S., at 315, 94 S.Ct., at 1110. ... Of particular relevance here, "[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." <u>Davis</u>, <u>supra</u>, at 316-317, 94 S.Ct., at 1110 (citing <u>Greene v. McElroy</u>, 360 U.S. 474, 496 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)).

The Court held, however, in <u>Van Arsdall</u>, 475 U.S. at 678-79, that the Confrontation Clause does not guarantee cross-examination "to whatever extent, the defense might wish." (citing <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985) ( per curiam)).

The Court in <u>Van Arsdall</u>, 475 U.S. at 689, further held that even where there is constitutional error in regard to the Confrontation clause, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." "The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence." <u>Id.</u> (citing <u>United States v. Nobles</u>, 422 U.S. 225, 230 (1975)). This rule "promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." <u>Id.</u> In regard to an allegation that a defendant's constitutional rights were violated by an officer's testifying regarding information he received from an informant, the Eighth Circuit has held that where error in this regard is "harmless beyond a reasonable doubt," a defendant's conviction should be affirmed. <u>United States v. Williams</u>, 181 F.3d 945, 952 (8th Cir. 1999). Indeed, under federal law, hearsay rule violations which implicate the confrontation clause are subject to the harmless beyond a reasonable doubt standard as articulated in <u>Chapman v. California</u>, 386 U.S. 18 (1967). <u>United States v. Copley</u>, 938 F.2d 107, 110 (8th Cir. 1991). "Appellate courts have repeatedly held that violations of the

confrontation clause caused by improper admission of hearsay statements are harmless beyond a reasonable doubt when there is overwhelming evidence of defendant's guilt." Id. (citations omitted).

As stated above, upon considering the issue of Petitioner's Ground 1, the Missouri appellate court considered that the scope of cross-examination is within the trial court's discretion and that Petitioner did not establish that the trial court abused its discretion. The court notes the overwhelming evidence of Petitioner's guilt which was presented at trial. See Van Arsdall, 475 U.S. at 678-79; Copley, 938 F.2d at 110. The court finds, therefore, that the Missouri appellate court's decision in regard to the issue of Petitioner's Ground 1 not contrary to federal law and is a reasonable application of federal law. See Van Arsdall, 475 U.S. at 678-79; Willis, 997 F.2d at 415; Wood, 834 F.2d at 1384. As such, the court finds that Petitioner's Ground 1 is without merit and that habeas relief on its basis should be denied.

## Ground 2 - The trial court erred in sustaining the State's objection to the closing argument of Petitioner's attorney when his attorney sought to draw an adverse inference from the fact that the State did not call Propane as a witness:

In support of Ground 2 Petitioner argues that the trial court erred when it prevented his counsel from arguing that an adverse inference should be drawn from the fact that the State did not call Propane as a witness. In particular, Petitioner contends that it was "improper for the court to presume that [Petitioner] was guilty ... before the verdict was in" and that the court's reasoning in sustaining the State's objection was "wholly contrary to the presumption of innocence." Doc. 25 at 4.

In the prosecutor's initial closing argument, no mention was made of any agreements or deals between Propane and the State. In the defense's closing argument, counsel argued that physical evidence against Petitioner was recovered after the police met with Propane and he led them to those items. In particular, the following transpired during the defense's closing argument:

DEFENSE COUNSEL: Where else does Propane come in? Why we find him right smack dab in the instructions of the Court, that he - - and this man's to answer for he and Bryan [Propane] for murder in the first degree. But, oh, there isn't any Bryan around. Is that fair? Is that being decent? Is that correct? He brought him around, brought all the evidence, and he isn't here. He isn't charged. Do you think that's fair?

THE STATE: Judge, there's been no evidence that Bryan hasn't been charged. He has been charged.

THE COURT: I'll sustain the objection.

DEFENSE COUNSEL: Well, this court file, which I could ask you to hand me, names one defendant. We can agree to that. And that's John Smith. And I ask you if that's fair. You look at their investigation and what they did.

They come in here and look like a million dollars against us. Make us look like we've been charged with conspiring, calling the Major Case Squad a conspiracy. The Major Case Squad doesn't have a conspiracy unless you want to include Judge Adler, Propane, and the people down on Brentwood Boulevard ....

...

They say - - the State says, well, we don't have anybody - - any eyewitness. Well, they certainly don't. What you have are statements made under duress. I can use that word safely. Under duress, under a long, ongoing questioning, together with an investigation that was prompted by a meeting down on Brentwood Boulevard for somebody that's not in the courtroom, not brought by - - into the courtroom and not charged with the crime of murder in the first degree ... [w]hen you weigh all of that, the hours on end, the indecency of the Propane role as it has been brought before you, and then you can determine whether or not you can reach a verdict and be satisfied that it is beyond a reasonable doubt.

Tr. at 853, 859, 861.

Upon addressing the issue of Petitioner's Ground 2 the Missouri appellate court first considered that a trial court has broad discretion to control the scope of closing argument and that such decisions are reversed only when there is a "reasonable probability that the verdict would have different had the error not been committed." Resp. Ex. E at 3-4. The Missouri appellate court further held that under Missouri law a party cannot argue an adverse inference from a failure to call a witness when the witness was "equally available, or unavailable to both parties." Resp. Ex. E at

4 (citing State v. Wallace, 43 S.W.3d 398, 404 (Mo. Ct. App. 2001)). The court noted that the three factors to determine equal availability are: "'(1) whether one party has a superior ability to know or identify the witness; (2) the nature of the testimony the witness is expected to give; and (3) whether one party's relationship with the witness indicates a likelihood that the witness would testify more favorably for that party than for the other.'" Resp. Ex. E at 4 (quoting State v. Ditzer, 119 S.W.3d 156, 165 (Mo. Ct. App. 2003)). The Missouri appellate court proceeded to find that Propane was equally available to the prosecution and the defense for the following reasons: first, Smith and Propane acted together in the plot to murder Smith's wife; second, Petitioner did not contend that Propane's testimony would have helped exonerate Petitioner; and, third, there was no indication that Propane was likely to testify in favor of the State in light of his participation in the murder and in light of his close friendship with Petitioner. Resp. Ex. E at 4.

Pursuant to Williams, the court will consider federal law applicable to the issue of Petitioner's Ground 2. First, under federal law "[t]he trial court has broad discretion in controlling the direction of ... closing arguments," and an appellate court will not reverse the trial court's determinations in this regard "absent a showing of abuse of discretion." United States v. Johnson, 968 F.2d 768, 769 (8th Cir.1992) (citing United States v. Segal, 649 F.2d 599, 604 (8th Cir.1981)). "The facts of each case must be examined independently to determine if" a defendant was unduly prejudiced. Id. at 770 (citing United States v. Splain, 545 F.2d 1131, 1135 (8th Cir.1976)). When the trial court sustains an objection to the closing argument of defense counsel, a reviewing court must consider whether sustaining the objection "rises to te level of" a Constitutional violation. United States v. Michaels, 911 F.2d 131, 132 (8th Cir. 1990).

Additionally, federal law provides that where a witness, in particular, a co-conspirator, is equally available to a defendant and the prosecution, a defendant is not entitled to argue to the jury

that inferences adverse to the State's case should be drawn from the prosecution's failure to call"

the co-conspirator. <u>United States v. Green</u>, 69 Fed. Appx. 612 at *1 (4th Cir. 2003) (per curiam).

The court finds that the decision of the Missouri appellate court in regard to the issue of

Petitioner's Ground 2 is not contrary to federal law and that it is a reasonable application of federal

law to the facts of Petitioner's case. <u>See</u> <u>Penry</u>, 532 U.S. at 792-93; <u>Williams</u>, 529 U.S. at 413;

<u>Johnson</u>, 968 F.2d at 769; <u>Michaels</u>, 911 F.2d at 132; <u>Green</u>, 69 Fed. Appx. 612 at *1. Additionally,

the decision of the Missouri appellate court was based on a reasonable determination of the facts in

light of the evidence presented at Petitioner's trial. <u>See</u> § 2254(d)(2). The court finds, therefore, that

Petitioner's Ground 2 is without merit and that habeas relief on its basis should be denied.

**Ground 3 - The trial court erred in allowing the prosecutor to argue in rebuttal that Propane would have his day in court and that the State occasionally made deals with criminals in order to catch and convict more dangerous criminals:**

In rebuttal to the defense's closing argument the prosecutor argued as follows:

Police go out and they find somebody with drugs, and they say, tell us where you got the drug from and we won't charge you with this offense. We'll charge you with a misdemeanor, maybe drug paraphernalia. And they tell them, and then they go and get the next guy. They go, who sold you the pound of marijuana? This guy down in Florida. Okay, I'll tell you what, since you cooperated with us, we won't charge you with a pound, we'll just charge you with an ounce. It will still be a felony, but we're more interested in getting the source. And then they go on and on and on and up the ladder. And that's what happened here. But Propane, I assure you, will have his day in court.

Tr. 868.

In support of Ground 3 Petitioner argues that "Supreme Court law requir[es] that the jury

know the facts that motivate a witness to assist the prosecution"; that Propane received a "deal" for

his assistance; that the terms of the deal were never disclosed; that the prosecutor's argument misled

the jury; that the jury should have been made aware of the terms of the deal; and that due process

requires that evidence be introduced which "would tend to impeach the credibility of any person

whom the government intends to call as a witness or any individual [] whom the prosecution has relied in the investigation." Doc. 25 at 7.

Defense counsel did not object to the prosecutor's mentioning Propane in rebuttal. As such, the issue of Petitioner's Ground 3 was considered by the Missouri appellate court for plain error review.[8] Upon addressing the issue of Petitioner's Ground 3, the Missouri appellate court considered that the prosecutor's comments regarding Propane were in response to Petitioner's closing argument, which questioned Propane's "whereabouts and the criminal charging of Propane." Resp. Ex. E at 5. The Missouri appellate court further considered that its plain error review required a finding that the allegedly objectionable argument had a "decisive effect on the jury's deliberations." Resp. Ex. E at 5. The Missouri appellate court found that Petitioner failed to show that the allegedly objectionable argument had a decisive effect on the jury and concluded that the allegedly objectionable argument was proper argument. Resp. Ex. E at 6.

Pursuant to Williams, the court will consider federal law applicable to Petitioner's Ground 3. The court has set forth above in regard to Ground 2 federal law applicable to closing argument.

---

[8]     The Eighth Circuit acknowledged in Hornbuckle v. Groose that "'[t]here appears to be a decisional split within our Circuit on whether plain-error review by a state appellate court waives a procedural default by a habeas petitioner, allowing collateral review by this court.'" 106 F.3d 253, 257 (8th Cir. 1997) (quoting Mack v. Caspari, 92 F.3d 637, 641 n.6 (8th Cir. 1996)). In Hornbuckle, 106 F.3d at 257, the Eighth Circuit chose to follow cases holding that where Missouri courts review procedurally defaulted claims of a habeas petitioner for plain error, the federal habeas court may likewise review for plain error. In Thomas v. Bowersox, 208 F.3d 699, 701 (8th Cir. 2000), the Eighth Circuit addressed the merits of a habeas petitioner's claim where the state court had reviewed the claim for plain error. More recently, however, in Evans v. Luebbers, 371 F.3d 438, 443 (8th Cir. 2004), the Eighth Circuit stated that a habeas claim was procedurally defaulted "notwithstanding the fact that the Missouri Court of Appeals reviewed the claim for plain error." Because the court finds for the reasons stated below that Petitioner's claims are without substantive merit, the court need not determine whether Petitioner's Ground 3 is procedurally barred. See also James v. Bowersox, 187 F.3d 866, 869 (8th Cir. 1999).

See Penry, 532 U.S. at 792-93; Williams, 529 U.S. at 413; Johnson, 968 F.2d at 769; Michaels, 911 F.2d at 132. Further, in regard to a prosecutor's closing arguments, the Eighth Circuit has held:

> A conviction will be overturned on the basis of inappropriate prosecutorial comments only if they have affected the overall fairness of the defendant's trial. United States v. Young, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). In determining whether reversal is merited, we consider whether the prosecutor's comments were actually improper within the context of the trial and, if so, whether they were so prejudicial that the defendant was deprived of his right to a fair trial. United States v. Eldridge, 984 F.2d 943, 946 (8th Cir.1993). Prejudice is determined in light the misconduct's cumulative effect, the strength of the evidence of the defendant's guilt, and the curative actions of the trial court. Id. at 946-47. In reviewing objections to the government's closing argument we must think about "the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." Young, 470 U.S. at 12, 105 S.Ct. 1038.
>
> The prosecutor's remarks in rebuttal must be viewed in their context. In his closing argument defense counsel had accused the prosecutor of deceiving the jury about the age and experience of testifying officers, of humiliating the defendant in cross examination, and of fabricating the testimony of its witnesses. A prosecutor "is entitled to make a fair response and rebuttal" if he or government agents or witnesses are attacked. United States v. Williams, 97 F.3d 240, 246 (8th Cir.1996) (quoting United States v. Lee, 743 F.2d 1240, 1253 (8th Cir.1984)). The rebuttal comments by the prosecution in this case were a responsive attempt to "right the scale" after the "defense counsel's opening salvo." Young, 470 U.S. at 12-13, 105 S.Ct. 1038; United States v. Franklin, 250 F.3d 653, 660-61 (8th Cir.2001). ... Moreover, the government presented strong evidence of [the defendant's] guilt, see United States v. Hernandez, 779 F.2d 456, 461 (8th Cir.1985).

United States v. Davis, 417 F.3d 909, 911-12 (8th Cir. 2005). See also United States v. Beaman, 361 F.3d 1061, 1066 (8th Cir. 2004) ("While the prosecutor's remark might well have been improper if unprovoked, '[w]here the prosecutor, his witnesses, or the work of government agents is attacked, the District Attorney is entitled to make a fair response and rebuttal.'" (quoting United States v. Lee, 743 F.2d 1240, 1253 (8th Cir.1984)).

In Petitioner's case the Missouri appellate court considered that the allegedly objectionable prosecutorial argument was made in response to the argument of defense counsel. See Davis, 417 F.3d at 911-12. Indeed, defense counsel addressed Propane's cooperation with police and his

leading the police to evidence which was used against Petitioner. Only after the defense made this argument did the prosecutor state that Propane would have his day in court and that the State occasionally makes deals with criminals. As such, the court finds that the decision of the Missouri appellate court in regard to the issue of Petitioner's Ground 3 is not contrary to federal law and that it is a reasonable application of federal law. See Davis, 417 F.3d at 911-12; Beaman, 361 F.3d at 1066. Additionally, the Missouri appellate court's decision was based on a reasonable determination of the facts in light of the evidence presented at Petitioner's trial. See § 2254(d)(2). The court finds, therefore, that Petitioner's Ground 3 is without merit and that habeas relief on its basis should be denied.

**Ground 4 - Petitioner's confession was improperly admitted into evidence because it was coerced**:

In support of Ground 4 Petitioner argues that the State court's failed to consider that he "testified at trial and denied making any incriminating statements"; that he made many requests to have an attorney present; that the police failed to honor his requests; and that the police fabricated incriminating statements. Doc. 25 at 14.

The trial court held a hearing on Petitioner's motion to suppress on November 10, 2004. Tr. 12. St. Louis County Police Officer Jim Monroe, who participated in the Major Case Squad investigation into the murder of Subrenia Smith, testified as the only witness for the State at the hearing. Tr. 13-14, 53. Petitioner did not testify or put on any evidence at the suppression hearing and the trial court denied the motion to suppress. Tr. 54. Officer Monroe also testified at trial. Tr. 524.

Officer Monroe testified that he and his partner, Detective Griemel, interviewed Petitioner at the hospital and at his home the next day; that during the hospital interview Petitioner told a nurse that he felt fine and did not need painkillers; that during the hospital interview Petitioner indicated

that he was able to walk and that he had, in fact, gotten up and walked to the bathroom. Tr. 16-21, 526-27, 544, 550.

Officer Monroe further testified that he and Detective Griemel were called to Bel-Nor Police Department on October 5, after Petitioner had been arrested; that they were asked to interview Petitioner; that they began the interview by giving Petitioner <u>Miranda</u> warnings; that Petitioner was given a copy of the Bel-Nor Police Department's <u>Miranda</u> form; that after each line was read aloud, Petitioner was asked if he understood the warning contained on that line; that Petitioner indicated that he understood each of the five lines of the form and wrote his initials next to each line, including the line indicating that he was willing to talk to the officers; and that Petitioner signed the <u>Miranda</u> form at 11:55 a.m. Tr. 22-25, 551-54.

Officer Monroe testified that during the post-arrest interview, Petitioner told the officers that Propane had come over to his house at about 2:00 p.m. on October 1 and had left before 6:00 p.m.; that Petitioner also said that he got home from work at 11:00 p.m. and that Propane came over a short time later; that about two hours into the interview, Detective Griemel told Petitioner that he believed the crime scene was staged and that Petitioner's version of what happened did not make sense; that Detective Griemel told Petitioner that the police had about 95% of the evidence in the case; and that Detective Griemel left the room because Officer Monroe and Petitioner had developed a good rapport and because Petitioner was less willing to talk to Detective Griemel. Tr. 556, 558-61. Officer Monroe also testified at trial that when Detective Griemel returned, he told Petitioner that boxer underwear with blood on it had been recovered and that forensic tests on them would come back to Petitioner and that in response Petitioner stated "I'm dead, I'm fucked. Life means nothing to me now. I don't have anything. It doesn't matter anymore." Tr. 562-63. Detective Griemel then

told Petitioner that it was the time to tell the truth and Petitioner replied that, "[n]othing I can say now can fix it or make it better." Tr. 563.

Officer Monroe also testified that at about 4:10 p.m., Petitioner requested and received a restroom break; that the break lasted about five or ten minutes; that upon Petitioner's return from the break Detective Griemel told Petitioner that police had recovered boxing gloves and a home-made silencer; that Petitioner responded, "I'm fucked, I never get a break"; that Petitioner was given some water at 5:10 p.m. and said that it was over, and that he was going to get the death penalty; that Detective Griemel again left the room and Officer Monroe asked Petitioner "if all this had to happen"; and that Petitioner then told Officer Monroe that he had no idea of what Petitioner had to deal with and that Subrenia "was constantly bitching." Tr. 563- 67. When asked if that was worth Subrenia's death, Petitioner said, "[h]ell, no, but there's nothing I can do to change it now. What's done is done." Tr. 567. Officer Monroe testified that Petitioner proceeded to state that Subrenia's death was a result of "the bitching, the cheating, and money." Tr. 567.

Officer Monroe testified that Detective Vogelpohl, then entered the room and asked Petitioner if Subrenia was alive or dead before Propane arrived; that Petitioner responded, "[m]an, why you doing this?"; that Petitioner then said that he would plead to whatever he was charged with, that he was responsible for Subrenia's death, and that Propane was responsible for taking the gun and other items out of the house; that Petitioner refused to go into the details of the murder, telling Monroe, "I don't want to tell you, Jim. It was real bad"; that Petitioner said that not even Johnny Cochran could get him out of this now; and that Petitioner was taken to his cell somewhere around midnight. Tr. 568-70, 599.

Officer Monroe testified that Petitioner was brought back to the interview room from his cell at about 2:00 a.m. and was shown photos of various items of evidence; that Petitioner identified the

boxing gloves that had been recovered as his; that Petitioner stated that he had gotten the long rifle for Propane and that Petitioner kept it at his house; that Petitioner said the black underwear and t-shirt found near Ben Monroe's studio were similar to items of clothing that he owned; that at some point in the interview Petitioner stated that he was willing to take the whole case; that Petitioner refused to discuss why Propane had removed the boxing gloves and long rifle from his house, along with other items; and that the session lasted fifteen to twenty minutes. Tr. 574-79, 596-97, 601.

Officer Monroe testified that he and Detective Vogelpohl resumed the interview at 11:35 a.m. on October 6th; that Petitioner was again given the <u>Miranda</u> warnings using the same form that had been utilized the previous day; that this interview lasted two to three hours; that neither officer threatened or hit Petitioner or did anything he considered coercive; and that Petitioner was allowed to have food and water and to take restroom breaks. Tr. 29-34, 573-74. Officer Monroe testified that during this interview Petitioner told the officers that he had complained to Propane about Subrenia's lack of appreciation, and that Propane indicated that he would kill Subrenia if Petitioner wanted him to; that Propane had looked-up in the computer ways to make a homemade silencer; that when Petitioner got home from work he called Propane at Ben Monroe's; that Propane came over; that Petitioner and Propane went down into the basement and called to Subrenia to come downstairs; that he did not hit Subrenia; that after Subrenia was shot, he and Propane began to make the scene appear as though Subrenia's death had been caused by burglars; and that Petitioner had Propane strike him in the face several times and then told Propane to shoot him in the leg. Tr.581-87. Officer Monroe testified that during the October 5 and 6 interviews Petitioner never told the officers that he wanted the questioning to stop or that he wanted an attorney. Tr. 26-32.

Officer Monroe said that later that day, he and Detective Vogelpohl took Petitioner to an intake center for a "fit for confinement" evaluation because of Petitioner's injuries; that under such

circumstances a hospital has to certify that the inmate is fit to be confined in jail; that at the intake center, while waiting for the nurse, Petitioner began making unsolicited comments to Officer Monroe, who advised Petitioner of the <u>Miranda</u> warnings given to him earlier that day; and that Petitioner continued talking about how he had told Propane to hit him and shoot him in the leg. Tr. 33-34, 51, 614-15.

Upon considering Petitioner's argument that his statements were improperly admitted into evidence, the Missouri appellate court considered that a court reviews a motion to suppress in the light most favorable to the ruling and defers to the trial court's determinations of credibility. The court further considered a trial court's ruling on a motion to suppress should only be reversed where the trial court's ruling is clearly erroneous. Resp. Ex. E at 6 (citing <u>State v. Adams</u>, 51 S.W.3d 94, 98 (Mo. Ct. App. 2001); <u>State v. Granado</u>, 148 S.W.3d 309 S.W.3d 309, 311 (Mo. 2004) (en banc)). The Missouri appellate court further considered the testimony at Petitioner's suppression hearing including that he was twice advised of his <u>Miranda</u> rights; that Petitioner waived his rights in writing; that Petitioner was permitted to take breaks and was given food and drink as requested; and that Petitioner did not present any evidence at the suppression hearing. Resp. Ex. E at 6. The Missouri appellate court concluded that Petitioner had not shown that the trial court's determination that Petitioner's confession was voluntary was clearly erroneous. Resp. Ex. E at 6.

Pursuant to <u>Williams</u>, the court will consider the issue raised in Petitioner's Ground 4. "There is no constitutional right for 'a criminal defendant to confess to his crime only when totally rational and properly motivated.'" <u>Lyons v. Luebbers</u>, 403 F.3d 585, 597 (8th Cir. 2005) (quoting <u>Colorado v. Connelly</u>, 479 U.S. 157, 166 (1986)). In <u>Connelly</u>, 479 U.S. at 16, the United States Supreme Court held that "[a]bsent police conduct causally related to the confession, there is simply no basis

for concluding that any state actor has deprived a criminal defendant of due process of law. In particular, the Court held in Connelly that:

> Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our Miranda doctrine, the State need prove waiver only by a preponderance of the evidence. See Nix v. Williams, 467 U.S. 431, 444, and n. 5, 104 S.Ct. 2501, 2509, and n. 5, 81 L.Ed.2d 377 (1984); United States v. Matlock, 415 U.S. 164, 178, n. 14, 94 S.Ct. 988, 996, n. 14, 39 L.Ed.2d 242 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence ..."). Cf. Moore v. Michigan, 355 U.S. 155, 161-162, 78 S.Ct. 191, 195, 2 L.Ed.2d 167 (1957). If, as we held in Lego v. Twomey, supra, the voluntariness of a confession need be established only by a preponderance of the evidence, then a waiver of the auxiliary protections established in Miranda should require no higher burden of proof. "[E]xclusionary rules are very much aimed at deterring lawless conduct by police and prosecution and it is very doubtful that escalating the prosecution's burden of proof in ... suppression hearings would be sufficiently productive in this respect to outweigh the public interest in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence." Lego v. Twomey, supra, 404 U.S., at 489, 92 S.Ct., at 626. See also United States v. Leon, 468 U.S., at 906-913, 104 S.Ct., at 3411-3415. ...

> There is obviously no reason to require more in the way of a "voluntariness" inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context. The sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion. See United States v. Washington, 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977); Miranda, supra, 384 U.S., at 460, 86 S.Ct., at 1620. Indeed, the Fifth Amendment privilege is not concerned "with moral and psychological pressures to confess emanating from sources other than official coercion." Oregon v. Elstad, 470 U.S. 298, 305, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985). The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word. See Moran v. Burbine, 475 U.S., at 421, 106 S.Ct., at 1141 ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.

Id. at 167-70.

Moreover, the Eighth Circuit holds that error in admitting a confession may be harmless "'where the other evidence against [a defendant was] so weighty it assured beyond a reasonable doubt that the jury would have returned a conviction even absent the confession.'" Lyons, 403 F.3d

at 597 (quoting United States v. Santos, 235 F.3d 1105, 1108 (8th Cir.2000)) (citing Mathenia v. Delo, 975 F.2d 444, 448 (8th Cir.1992) (holding that while a death-penalty habeas applicant's "graphic confession was destructive to his defense, it was far from the only evidence against him," and the district court correctly found "the defense was not prejudiced since the outcome would not have been different had the confession been suppressed"); United States v. Packer, 730 F.2d 1151, 1157 (8th Cir.1984) ("The admission of statements obtained in violation of Miranda may constitute harmless error when there remains overwhelming independent evidence as to the defendant's guilt.").

Further, whether a confession was voluntary is a mixed question of law and fact. See e.g., United States v. Mendoza, 85 F. 3d 1347 (8th Cir. 1996). "In determining whether a confession is voluntary, a court should examine the circumstances surrounding the confession, including 'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'" (internal quotation marks excluded) (quoting United States v. Johnson, 47 F.3d 272, 275 (8th Cir.1995)). Upon review of a trial court's denying a motion to suppress, "credibility determinations of the district court are entitled to great deference." United States v. Andrews, 454 F.3d 919, 921 (8th Cir. 2006).

Only after considering that prior to making statements to the police, Petitioner had been informed of his Miranda rights and that Petitioner waived those rights as well as considering that Petitioner's requests for breaks, food, and drink were accommodated, did the Missouri appellate court finds that Petitioner's statements were voluntary. Further, the Missouri appellate court deferred to the factual findings of the trial court. As such, the court finds that the decision of the Missouri appellate court is not contrary to federal law and that it is a reasonable application of federal law. See Connelly, 479 U.S. at 167; Andrews, 454 F.3d at 921; Lyons, 403 F.3d at 597;

Mendoza, 85 F.3d 1347. The court further finds that the decision of the Missouri appellate court was based on a reasonable determination of the facts in light of the evidence presented at Petitioner's trial. See § 2254(d)(2); Andrews, 454 F.3d at 921. The court finds, therefore, that Petitioner's Ground 4 is without merit and that habeas relief on its basis should be denied.

**Ground 5 - The trial court erred in failing to sustain Petitioner's objection to testimony that he had guns in his house[9]:**

In support of Ground 5 Petitioner argues that although the court instructed the jury to disregard the firearms found in Petitioner's house, the introduction of this evidence prejudiced Petitioner. Petitioner further argues that when considering the evidence regarding the firearms, the court should have considered the cumulative effect of constitutional errors at his trial. Doc. 25 at 15-16.

During the examination of Detective Robert Sieck, the State elicited testimony that firearms and ammunition were seized from Petitioner's home. After Detective Sieck listed the items seized, defense counsel objected on the grounds that the items were not related to the murder. The trial court sustained the objection on the ground that the seized weapons and ammunition were not relevant. Tr. 403-404. Subsequently, defense counsel asked the court to instruct the jury to disregard the evidence of the seized firearms and ammunition. The trial court denied defense counsel's request on the ground that the request had not been timely made. Tr. 406. Thereafter, the

---

[9] The following items were seized from Petitioner's house: a Sears Model 101.7 410-gauge double barrel shotgun; a JC Higgins bolt action 20-gauge shotgun; a Ruger Model 10/22, .22 caliber rifle; an Iver Johnson single shot 410-gauge shotgun; a Remington Model 742, 30-06 caliber semiautomatic rifle; an unknown brand military style rifle; a pellet pistol in a case; a Ruger magazine, which holds cartridges; a magazine of 30-06 cartridges and a box of cartridges; a magazine with eight rounds of .303 cartridges; and a 22 caliber stainless steel cylinder from a revolver. Tr. 402-404.

prosecutor questioned Detective Sieck about a .22 caliber cylinder found in the basement of the home. Defense counsel objected and the court sustained the objection. Tr. 408-09. The trial court then, sua sponte, stated to the jury, "[s]o the jury understands, when I sustain an objection, you're not to consider that matter in the case." Tr. 409.

The Missouri appellate court addressed the issue of Petitioner's Ground 5 pursuant to plain error review and found that to prevail Petitioner was required to show manifest injustice and that the error of which he complained was outcome determinative.[10] The Missouri appellate court considered that Petitioner's objection to the introduction of evidence regarding guns in his home was sustained due to relevancy. The court also considered that the jury was instructed, sua sponte, by the trial court that when an objection is sustained they are not to consider "that matter." The Missouri appellate court concluded that jurors are presumed to follow the court's instructions; that Petitioner presented no argument that jurors failed to follow the court's instruction; and that, therefore, Petitioner's point should be denied.

First, the United States Supreme Court held in Estelle v. McGuire that "'federal habeas corpus relief does not lie for errors of state law'" and that "it is not province of a federal habeas court to reexamine state-court determinations on state-law questions." 502 U.S. 62, 67-68 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990) and (citing Pulley v. Harris, 465 U.S. 37, 41 (1984)). The Court further held that "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68 (citing 28 U.S.C. § 2241; Rose v. Hodges, 423 U.S. 19, 21 (1975) (per curiam )). Because the admission or exclusion of evidence is primarily a question of state law, an evidentiary determination rarely gives rise to a federal question reviewable in a habeas petition. Scott v. Jones,

---

[10]        See n.5 above.

915 F.2d 1188, 1190-91 (8th Cir. 1990). Federal courts "may not review evidentiary rulings of state courts unless they implicate federal constitutional rights." Evans v. Luebbers, 371 F.3d 438, 443 (8th Cir. 2004) (citing Estelle, 502 U.S. at 68); Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir. 1995); Rainer v. Department of Corrections, 914 F.2d 1067, 1072 (8th Cir. 1990). See also Abdi v. Hatch, 450 F.3d 334, 338 (8th Cir. 2006) ("The admission of evidence at a state trial provides a basis for federal habeas relief when the 'evidentiary ruling infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process.'") (quoting Turner v. Armontrout, 845 F.2d 165, 169 (8th Cir.1988)); Sweet v. Delo, 125 F.3d 1144, 1157-58 (8th Cir. 1997) (holding that the exclusion of evidence violates due process if "the asserted error was 'so conspicuously prejudicial or of such magnitude that it fatally infected the trial and deprived [the petitioner] of fundamental fairness'") (quoting Logan v. Lockhart, 994 F.2d 1324, 1330 (8th Cir. 1993)); Mercer v. Armontrout, 844 F.2d 582, 587 (8th Cir. 1988) (holding that to justify the grant of habeas corpus, the error must be "so 'gross'... 'conspicuously prejudicial'... or otherwise of such magnitude that it fatally infected the trial and failed to afford [petitioner] the fundamental fairness which is the essence of due process"); Manning-El v. Wyrick, 738 F.2d 321, 322 (8th Cir.1984) (holding that questions concerning admissibility of evidence are matters of state law and are not reviewable in a federal corpus proceeding unless the asserted error infringed a specific constitutional protection or was so prejudicial as to deny due process); Logan v. Lockhart, 994 F.2d 1324, 1330 (8th Cir. 1993) ("Questions regarding admissibility of evidence are matters of state law, and they are reviewed in federal habeas inquiries only to determine whether an alleged error infringes upon a specific constitutional protection or is so prejudicial as to be a denial of due process.").

The Eighth Circuit held in Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir. 1995), in regard to § 2254 review by a federal court:

[W]e will reverse a state court evidentiary ruling only if the "petitioner ⋯ show[s] that the alleged improprieties were 'so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair.' To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial-i.e., that absent the alleged impropriety the verdict probably would have been different." [Hamilton v. Nix, 809 F.2d 463, 470 (8th Cir. 1987)] (citations omitted). ... Of particular importance is the frequency and pervasiveness of the alleged misconduct in the context of the entire trial, the weight of the evidence supporting guilt, and whether the trial judge gave a cautionary instruction to the jury on how to properly use the testimony elicited. Hamilton, 809 F.2d at 470. Cf. United States v. Jackson, 41 F.3d 1231, 1233 (8th Cir.1994) (detailing this three-part inquiry for claims of prosecutorial misconduct on direct appeal).

The court finds, therefore, that the issue raised in Petitioner's Ground 5 is not cognizable pursuant to federal habeas review.

Alternatively, pursuant to Williams, the court will consider federal law applicable to Petitioner's Ground 5. Under federal law, "the admission of evidence is a matter of discretion for the trial court, and the trial court's determination that evidence is relevant and that its probative value outweighs the danger of unfair prejudice will not be reversed on appeal unless the trial court has abused that discretion." United States v. Macklin, 104 F.3d 1046, 1048 (8th Cir. 1997) (citing United States v. Delpit, 94 F.3d 1134, 1146 (8th Cir.1996); United States v. Just, 74 F.3d 902, 904 (8th Cir.1996)). Even where admission of evidence is erroneous, such admission does not necessarily fatally infect a trial. See e.g., Kuntzelman v. Black, 774 F.2d 291, 292 (8th Cir. 1985) (per curiam) (finding no error of constitutional magnitude in the admission of "particularly gruesome" photographs where the photographs "were at least arguably relevant and probative in showing the identity and condition of the deceased, the location of the wound, and the intent of [the petitioner] in firing the shot that killed [the victim]").

Additionally, the Eighth Circuit has held that "[r]ulings on the admission or exclusion of evidence in state trials rarely rise to the level of a federal constitutional violation. '[O]nly the

exclusion of critical, reliable and highly probative evidence will violate due process.'" <u>Nebinger v. Ault</u>, 208 F.3d 695, 697 (8th Cir. 2000) (quoting <u>Sweet v. Delo</u>, 125 F.3d 1144, 1158 (8th Cir.1997). "The admission of evidence at a state trial provides a basis for federal habeas relief when the 'evidentiary ruling infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process.'" <u>Abdi v. Hatch</u>, 450 F.3d 334, 338 (8th Cir. 2006) (quoting <u>Turner v. Armontrout</u>, 845 F.2d 165, 169 (8th Cir.1988)).

First, the Missouri appellate court considered that the trial court did grant the defense's objection to evidence regarding the guns and gave a curative instruction, although it did not do so immediately upon Petitioner's counsel making such a request. Federal law provides that a jury is presumed to have followed the court's instructions. <u>See</u> <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000); <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987). Second, Petitioner has not established that testimony regarding firearms and ammunition found in his home violated a specific constitutional right or was so prejudicial as to be a denial of due process. <u>See</u> <u>Abdi</u>, 450 F.3d at 338. As such, the court finds, in the alternative, that the decision of the Missouri appellate court in regard to the issue of Petitioner's Ground 5 is not contrary to federal law and that it is a reasonable application of federal law. <u>See</u> <u>Weeks</u>, 528 U.S. at 234; <u>Richardson</u>, 481 U.S. at 211; <u>Abdi</u>, 450 F.3d at 338. Additionally, the Missouri appellate court's decision was based on a reasonable determination of the facts in light of the evidence presented at Petitioner's trial. <u>See</u> § 2254(d)(2). The court finds, therefore, that Petitioner's Ground 5 is without merit and that habeas relief on its basis should be denied.

**Ground 6 - Petitioner received ineffective assistance of counsel because counsel failed to call Propane as a witness:**

In support of Ground 6 Petitioner argues that Propane was a State endorsed witness; that Petitioner was entitled to confront Propane; and that trial counsel's performance was deficient because counsel denied Petitioner his right to confront Propane. Doc. 25 at 9.

Upon considering the issue of Petitioner's Ground 6, the Missouri appellate court considered that to prevail on a claim of ineffective assistance of counsel based on failure to call a witness a movant must show that: "(1) counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have provided a viable defense." Resp. Ex. J at 3 (citing Phillps v. State, 214 S.W.3d 361, 366 (Mo. Ct. App. 2007)). The court further considered that a decision not to call a witness is one of trial strategy; that to prevail a movant must clearly establish that counsel's performance was not reasonable; and that "the witness's testimony must unqualifiedly support the movant." Resp. Ex. J at 3-4 (citing Phillps, 214 S.W.3d at 366). The Missouri appellate court considered the motion court's finding that counsel's decision not to call Propane was "reasonable trial strategy because it eliminated the risk of having Propane, a co-defendant, testify, and it allowed [Petitioner's] counsel to inject the issue of Propane's deal with the State to help discredit the State's evidence." Resp. Ex. J at 4. The Missouri appellate court concluded that Petitioner made only conclusory assertions that the source of the State's evidence was Propane and that evidence of Propane's deal would have caused the jury to question Propane's motivation for cooperating with the police and to believe that Propane was the actual murderer. The Missouri appellate court also concluded that Petitioner did not rebut the presumption that failing to call Propane was reasonable trial strategy. As such, the Missouri appellate court affirmed the decision of the motion court in regard to the issue of Petitioner's Ground 6.

Pursuant to Williams, the court will consider federal law applicable to the issue raised in Petitioner's Ground 6. The court has set forth above the standard applicable to claims of ineffective assistance of counsel. Additionally, as discussed above, the Supreme Court holds that judicial scrutiny of counsel's performance must be highly deferential and that trial counsel's performance must not be judged in hindsight. Strickland, 466 U.S. at 688-89. Counsel must exercise reasonable diligence to produce exculpatory evidence. Kenley v. Armontrout, 937 F.2d 1298, 1304 (8th Cir. 1991). The Eighth Circuit has stated that "[d]ecisions relating to witness selection are normally left to counsel's judgment, and 'this judgment will not be second-guessed by hindsight.'" Hanes v. Dormire, 240 F.3d 694, 698 (8th Cir. 2001) (citations omitted). Where some potential witnesses' testimony might have been helpful in rebutting or clarifying evidence, in order to establish a constitutional violation a habeas petitioner must establish that the "proffered testimony was so important as to put counsel's failure to consult with or call [ ] witnesses outside the wide range of strategic choices that counsel is afforded." Id. The decision whether to call witnesses, cross-examine witnesses, or introduce evidence may be a matter of trial strategy. Hall v. Lubbers, 296 F.3d 685, 694 (8th Cir. 2002); Battle v. Delo, 19 F.3d 1547,1556 (8th Cir. 1994). "Strategic decisions 'made after thorough investigation of law and facts ... are virtually unchallengeable,' even if that decision later proves unwise." Strickland, 466 U.S. at 590.

In particular, the Eighth Circuit has held that where defense counsel fails to interview or call an alleged accomplice as a witness, to obtain habeas relief it is not enough that a petitioner merely offer speculation that he was prejudiced by counsel's conduct. See Sanders v. Trickey, 875 F.2d 205, 210 (8th Cir. 1989).

The Missouri appellate court considered that determining whether to call a witness is a matter of trial strategy; that given the circumstances, defense counsel's decision not to call Propane

was reasonable; that Petitioner made only conclusory assertions regarding Propane's testimony; and that Petitioner had not rebutted the presumption that it was reasonable trial strategy not to call Propane. As such, the court finds that the decision of the Missouri appellate court in regard to the issue of Petitioner's Ground 6 is not contrary to federal law and that it is a reasonable interpretation of federal law. See Strickland, 466 U.S. at 688- 90; Hall, 296 F.3d at 694; Battle, 19 F.3d at 1556; Sanders, 875 F.2d at 210. The court further finds that the decision of the Missouri appellate court was based on a reasonable determination of the facts in light of the evidence presented at Petitioner's trial. See § 2254(d)(2); Andrews, 454 F.3d at 921. The court finds, therefore, that Petitioner's Ground 7 is without merit and that habeas relief on its basis should be denied.

**Ground 7 - Petitioner received ineffective assistance of counsel because counsel failed to call the prosecutor as a witness to testify about the deal that the State made with Propane:**

Petitioner argues in support of Ground 7 that he was "entitled to invoke the Compulsory Clause of the Sixth Amendment to secure the attendance of a witness"; that "the prosecutor had first hand knowledge of the state's 'deal' with Propane"; and that "post conviction counsel clearly established that the prosecutor would have testified regarding the state's 'deal' with Propane." Doc. 25 at 14.

In regard to the issue of Petitioner's Ground 7, the Missouri appellate court held:

Movant has only made conclusory assertions regarding the Prosecutor's testimony and has failed to set forth any facts the Prosecutor would have testified to that would negate Movant's culpability. Thus, Movant cannot show he was prejudiced by his counsel's failure to secure the Prosecutor's testimony. Further, Movant cannot show the Prosecutor would have been allowed to testify. The trial court exercises discretion in determining to what extent and as to what maters a prosecuting attorney may be permitted to testify. State v. Walton, 899 S.W.2d 915, 919 (Mo. App. W.D. 1995). However, the general rule is that the right to have a prosecutor to testify in a criminal case is strictly limited to those instances where his testimony is made necessary by the peculiar and unusual circumstances of the case. State v. Werneke, 958 S.W.2d 314, 321 (Mo. App. W.D. 1997). If a prosecutor is aware, prior to trial, that he will be a necessary witness, or, if he discovers this fact in the course of the

trial, he should withdraw and have other counsel prosecute the case. State v. Hayes, 473 S.W.2d 688, 692 (Mo. 1971).

In this case, the record shows that there were several other people who were available to testify regarding Propane's deal with the State. Thus, it was not necessary for the Prosecutor to testify.

... Point denied.

Resp. Ex. J at 5-6.

Pursuant to Williams, the court will consider federal law applicable to Petitioner's Ground 7. The court has set forth above the standard applicable to claims of ineffective assistance of counsel. Additionally, the Eighth Circuit has held:

Whether a defending or prosecuting attorney may testify in a case he is trying is within the discretion of the district court. United States v. Buckhanon, 505 F.2d 1079, 1084 (8th Cir.1974); Gajewski v. United States, 321 F.2d 261, 268 (8th Cir.1963), cert. denied, 375 U.S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416 (1964). Requests for such testimony are disfavored. United States v. Prantil, 764 F.2d 548, 551 (9th Cir.1985); United States v. Dupuy, 760 F.2d 1492, 1498 (9th Cir.1985). The party seeking such testimony must demonstrate that the evidence is vital to his case, and that his inability to present the same or similar facts from another source creates a compelling need for the testimony. See Gajewski, 321 F.2d at 269 (defendant must show prosecutor "possesses information vital to the defense"); Prantil, 764 F.2d at 551 ("a defendant has an obligation to exhaust other available sources of evidence before a court should sustain [his] efforts to call a participating prosecutor as a witness"); United States v. Tamura, 694 F.2d 591, 601 (9th Cir.1982) (movant must demonstrate a "compelling need" for opposing counsel's testimony). The District Court's ruling on such a motion will not be reversed "'absent a clear and prejudicial abuse of discretion.'" United States Envtl. Protection Agency v. City of Green Forest, Ark., 921 F.2d 1394, 1409 (8th Cir.1990).

United States v. Watson, 952 F.2d 982, 986 (8th Cir. 1991).

Upon denying Petitioner post-conviction relief on the basis of Ground 7, the Missouri appellate court considered that Petitioner was not prejudiced by counsel's failure to call the prosecutor to testify; that it was within the trial court's discretion to determine whether the prosecutor could testify; and that there were other persons who could testify regarding the State's deal with Propane. As such, the court finds that the decision of the Missouri appellate court, in

regard to the issue of Petitioner's Ground 7, is not contrary to federal law and that it is a reasonable application of federal law. See Strickland, 466 U.S. at 587-90; Watson, 952 F.2d at 986. The court further finds that the decision of the Missouri appellate court was based on a reasonable determination of the facts in light of the evidence presented at Petitioner's trial. See § 2254(d)(2). The court finds, therefore, that Petitioner's Ground 7 is without merit and that habeas relief on its basis should be denied.

**Ground 8 - Petitioner received ineffective assistance of counsel because counsel failed to call A.J. Smith to testify about Petitioner's alibi on the night of the crime:**

In support of Ground 8 Petitioner argues that A.J. Smith "was interviewed in a room next to where Propane's interview was being held, and overheard the police asking about a rifle that was found in the bed of his father's truck." Doc. 25 at 16. Before the Missouri appellate court Petitioner contended that A.J. Smith would have testified as to what time Petitioner left their grandmother's house on the evening of October 1-2, 2002, what A.J. and Petitioner did before Petitioner dropped him off at his grandmother's house, and what took place during A.J.'s custodial interrogation. Petitioner argued that he testified at trial that he and A.J. were cleaning a building until 10:00 p.m. on October 1, 2002; that they ran some errands before Petitioner dropped A.J. off at their grandmother's house; and that Petitioner returned home around midnight. Tr. 729-32.

Upon addressing the issue of Petitioner's Ground 8, the Missouri appellate court considered that Petitioner argued that A.J.'s testimony could have corroborated his testimony regarding his whereabouts the night of Subrenia's death. The court further considered that Petitioner failed to state the time at which he departed from his grandmother's house and "how this departure time would have provided [him] with a viable defense"; that the evidence was the Petitioner "returned home around midnight, called Propane, who came to his house, and the murder took place shortly thereafter"; and that, therefore, Petitioner's "activities with A.J. earlier in the night were

inconsequential." Resp. Ex. J at 6. The Missouri appellate court, therefore, found that counsel was not ineffective for failing to call A.J. to testify. Resp. Ex. J at 7.

The court has set forth above the standard applicable to claims of ineffective assistance of counsel and, in particular, to claims that counsel was ineffective for failing to call a witness. The court notes that the State presented evidence that the murder took place between 12:15 a.m. and 1:20 a.m. Thus, as stated by the Missouri appellate court, Petitioner's activities with A.J. on the night of October 1, 2002, are inconsequential to Petitioner's defense. As such, Petitioner cannot contend that he was prejudiced by the failure of counsel to call A.J. as a witness. The court finds that the decision of the Missouri appellate court in regard to the issue of Petitioner's Ground 8 is not contrary to federal law and that it is a reasonable application of federal law. Strickland, 466 U.S. at 687-90. The court further finds that the decision of the Missouri appellate court was based on a reasonable determination of the facts in light of the evidence presented at Petitioner's trial. See § 2254(d)(2). The court finds, therefore, that Petitioner's Ground 8 is without merit and that habeas relief on its basis should be denied.

**Ground 9 - Petitioner received ineffective assistance of counsel because counsel failed to introduce into evidence Petitioner's medical records detailing his gunshot wounds:**

Petitioner argues in support of Ground 9 that medical records would have impeached police testimony regarding the length of his interrogation. Petitioner further states that his trial counsel made a "half-hearted attempt at getting the medical records admitted" and that this "half-hearted attempt" demonstrates counsel's lack of advocacy on behalf of Petitioner. Doc. 25 at 17.

The transcript of Petitioner's trial reflects that Petitioner testified on direct examination that he was treated for gunshot wounds, abrasions, and lacerations at DePaul Hospital; that he was given medicine at the hospital; and that this medicine included, Vicodin, Darvocet, antibiotics, and something for his stomach. Upon Petitioner's testifying that he did not remember what other

45

medications he was given, his trial counsel said, "you keep looking over towards our desk. We do have some records from DePaul." At that point the prosecutor objected to counsel's comment and the court sustained the objection. Counsel continued direct examination of Petitioner by asking him if he was admitted to the hospital, to which question Petitioner answered that he was. Tr. 740-41.

Upon addressing the issue of Petitioner's Ground 9 the Missouri appellate court considered that Petitioner argued that medical records would have proven he was heavily medicated when he spoke to the police while at the hospital; that his inconsistent statements were used to incriminate him; that medical records would have shown that the inconsistencies were caused by the medication he was taking; and that, therefore, counsel was ineffective for failing to obtain Petitioner's medical records and for failing to admit them at the hearing on Petitioner's motion to suppress. The Missouri appellate court further considered that the motion court found that Petitioner "failed to elaborate what medication he received and failed to allege the medications affected his ability to understand or think clearly"; that Petitioner did not allege that his confession resulted from "any medicinal influence"; and that Petitioner failed to state facts which would have changed the court's ruling on the motion to suppress. Resp. Ex. J at 7.

Upon denying Petitioner relief on the basis of Ground 9, the Missouri appellate court considered that Detective Monroe testified that when he interviewed Petitioner at the hospital, Petitioner "told a nurse he had just taken some aspirin and felt fine and did not need painkillers." The court also considered that Detective Monroe testified that during his interrogation Petitioner, Petitioner "was allowed food, water, and bathroom breaks whenever he requested." Resp. Ex. J at 7-8. The Missouri appellate court held:

> Where a movant claimed an investigation to determine the effects of his medication could have changed the result of the case, we held his conclusions were not sufficient to warrant an evidentiary hearing in that he did not recite what the doctor's testimony would have been, only what it "could have" been. State v. Wishom, 824

46

S.W.2d 101, 103 (Mo. App. E.D. 1992). Similarly, in this case, Movant made only general allegations about painkillers and antibiotics and failed to identify specific facts detailing what medications were prescribed, when they were prescribed, when they were taken, or how they affected the voluntariness of Movant's statements spanning several days. Further, Movant did not assert that he had any medical expert testimony regarding the effect the medications had on him.

Resp. Ex. J at 8.

Pursuant to Williams, the court will consider federal law applicable to the issue of Petitioner's Ground 9. The court has set forth above the standard applicable to claims of ineffective assistance of counsel. In particular, the Eighth Circuit has held that, "[t]o obtain relief on the theory that [trial counsel] was ineffective for failing to introduce the medical records, [a habeas petitioner] must show a reasonable probability that the failure to introduce the records affected the outcome of the trial." Marcrum v. Luebbers, 509 F.3d 489, 507 (8th Cir. 2007). Further, defense counsel is not required to present evidence that is "highly implausible." Thomas v. Bowersox, 208 F.3d 699, 702 (8th Cir.2000).

The Missouri appellate court considered, among other things, that Petitioner did not suggest what medications he was taking or when they were prescribed, nor did he establish how any medications he was taking affected the voluntariness of his statements. As such, the court finds that the decision of the Missouri appellate court in regard to the issue of Petitioner's Ground 9 is not contrary to federal law and that it is a reasonable application of federal law. See Strickland, 466 U.S. at 687-90; Marcrum, 509 F.3d at 507; Thomas, 208 F.3d at 702. The court further finds that the decision of the Missouri appellate court was based on a reasonable determination of the facts in light of the evidence presented at Petitioner's trial. See § 2254(d)(2). The court finds, therefore, that Petitioner's Ground 9 is without merit and that habeas relief on its basis should be denied.

**Ground 10 - Petitioner received ineffective assistance of counsel because counsel failed to call Petitioner as a witness at the suppression hearing:**

In support of Ground 10, Petitioner agues that trial counsel was aware of Petitioner's position that the police's version was false but that counsel failed to call him as a witness at the suppression hearing. Doc. 25 at 18.

In regard to the issue of Petitioner's Ground 10, the Missouri appellate court first considered that Petitioner argued that his testimony was necessary to refute the testimony of Detective Monroe regarding Petitioner's mental state during his questioning. The Missouri appellate court further considered that the motion court noted that counsel raised the issue of Petitioner's medications at the suppression hearing "but chose to develop it more fully at trial where it could present new evidence of [Petitioner's] involuntary statements to police"; that Petitioner put on evidence regarding the voluntariness of his statements; and that the jury was given an instruction on the issue of the voluntariness of Petitioner's statements. The appellate court also considered that the motion court found that it was reasonable trial strategy not to call Petitioner as a witness at his suppression hearing. Resp. Ex. J at 8.

In regard to the issue of Ground 10, the Missouri appellate court held:

> Movant again alleges he could have testified that he was on medication. As in the point above, Movant fails to allege that any of the medications he was taking rendered his confession unknowing or involuntary. As indicated by the lack of specificity in his allegations, Movant's testimony regarding the medications would not have changed the outcome of the hearing on the motion to suppress. Further, Movant noted in his amended motion for post-conviction relief that his trial counsel did not want him to testify at the hearing on the motion to suppress because he did not want to "show his hand" to the State before trial. Movant's counsel chose to wait until after Detective Monroe had been excused to present Movant's testimony that he had been given medication, threatened with a stun gun, and forced to sign forms waiving his <u>Miranda</u> rights during his interrogation.

Resp. Ex. J at 9.

The Missouri appellate court proceeded to find that the motion court's findings of fact and conclusions of law were not clearly erroneous and that Petitioner did not receive ineffective assistance of counsel because counsel did not call Petitioner to testify at the suppression hearing. Resp. Ex. J at 9.

Pursuant to <u>Williams</u> the court will consider federal law applicable to Petitioner's Ground 10. The court has set forth above the standard applicable to claims of ineffective assistance of counsel and, in particular, ineffective assistance of counsel based on the failure to call a witness. Additionally, in regard to such a claim, the Eighth Circuit has found that a habeas petitioner cannot establish prejudice where the petitioner testified at trial and where his testimony at trial did not establish the claim made at the suppression hearing. <u>See</u> <u>Johnson v. Norris</u>, 537 F.3d 840 (8th Cir. 2008) (holding that it is reasonable trial strategy not to call a defendant to testify at a suppression hearing unless he can "'really help himself" because there is a risk that testimony by the defendant would "open the door' to potentially damaging evidence" and because the defendant "puts himself subject to cross-examination by the prosecutor"); <u>Beeman v. State of Iowa</u>, 108 F.3d 181, 185 (8th Cir. 1997) ("Counsel's decision not to call [the petitioner] to testify at the suppression hearing did not result in prejudice, since [the petitioner's] testimony at trial did not establish any coercion by the police."). <u>See</u> <u>also</u> <u>United States v. Bentley</u>, 706 F.2d 1498, 1511 (8th Cir. 19893) (holding that counsel was not ineffective for failing to introduce evidence at a suppression hearing where the court was "supplied with nothing to indicate that additional favorable evidence existed on this issue or that trial counsel failed to discover such evidence").

The Missouri appellate court adopted the finding of the motion court that the decision of counsel not to have Petitioner testify at the suppression hearing was reasonable trial strategy and that Petitioner did not show that the outcome would have been different if he had testified. As such,

the decision of the Missouri appellate court in regard to the issue of Petitioner's Ground 10 is not contrary to federal law and it is a reasonable application of federal law. See Strickland, 466 U.S. at 687-90; Johnson, 537 F.3d 840; Beeman, 108 F.3d at 185; Bentley, 706 F.2d at 1511. The court further finds that the decision of the Missouri appellate court was based on a reasonable determination of the facts in light of the evidence presented at Petitioner's trial. See § 2254(d)(2). The court finds, therefore, that Petitioner's Ground 10 is without merit and that habeas relief on its basis should be denied.

**Ground 11 - Petitioner received ineffective assistance of counsel because counsel failed to argue in the motion for new trial that juror #12 was sleeping during trial:**

In support of Ground 11 Petitioner argues that the Missouri appellate court erred when it found that trial counsel did not know about the sleeping juror until after the motion for a new trial was due. Petitioner further argues that as a result of counsel's conduct he "was subjected to a jury that had not heard all of the evidence." Doc. 15 at 18-19.

Upon denying Petitioner relief on the issue of his Ground 11, the Missouri appellate court considered that Petitioner raised this issue for the first time at his sentencing hearing; that Petitioner's testimony at a hearing on this matter contradicted his claim that he alerted his trial counsel at trial; that Petitioner testified that he "did not really pay attention to the alleged sleeping juror at the time, but brought it up to his trial counsel later after he read something about it in a book"; that when the trial court asked Petitioner at the close of all evidence if he had anything he wanted to bring to the court's attention, Petitioner did mention the sleeping juror; and that Petitioner did not notify his trial counsel of the alleged sleeping juror until after the deadline for filing a motion for a new trial had passed." Resp. Ex. J at 10. The Missouri appellate court concluded that because "trial counsel was not informed about the alleged sleeping juror until after the deadline for filing a motion for new trial, counsel cannot be ineffective for failing to include this claim of error." Resp.

Ex. J at 10 (citing <u>Morris v. State</u>, 547 S.W.2d 827, 830 (Mo. Ct. App. 1976)). The Missouri appellate court continued to hold:

> Further, Movant's motion merely states Juror Number 12 "slept during trial and therefore missed critical evidence." The mere fact that a juror slept during the trial does not entitle Movant to relief, he must have been prejudiced by that sleeping. <u>Vann v. State</u>, 26 S.W.3d 377, 381 (Mo. App. S.D. 2000). Movant's motion asserts only a conclusory allegation and not a sufficient pleading of facts. <u>See id.</u> Movant does not identify at what point during the trial the juror was sleeping, what specific evidence he missed, or what testimony he did not hear. <u>See</u> <u>id.</u> Therefore, Movant has failed to sufficiently show prejudice from the alleged sleeping juror.

Resp. Ex. J at 11.

Pursuant to <u>Williams</u>, the court will consider federal law applicable to Petitioner's Ground 11. The court has sets forth above the standard applicable to claims of ineffective assistance of counsel. Additionally, it within a trial court's discretion whether to grant a mistrial on the basis that a juror slept during a defendant's trial. <u>See</u> <u>United States v. Evans</u>, 272 F.3d 1069, 1087 (8th Cir. 2001) (finding no abuse of discretion where district judge, upon being informed that one juror had been sleeping, observed the juror, decided that the juror seemed "okay," and declined to grant mistrial). Furthermore, federal law provides that general assertions that a juror slept through "'the critical presentation of [defendant's] evidence'" are too vague to warrant a mistrial. <u>United States v. Tierney</u>, 947 F.2d 854, 868-69 (8th Cir.1991) (quoting <u>Tanner v. United States</u>, 483 U.S. 107, 125 (1987)).

As stated above, the Missouri appellate court rejected Petitioner's claim of ineffective assistance of counsel on the ground that Petitioner had only made a general assertion and had not suggested how he had been prejudiced by the juror's sleeping. As such, the court finds that the decision of the Missouri appellate court in regard to the claim of Petitioner's Ground 11 is not contrary to federal law and that it is a reasonable application of federal law. <u>See</u> <u>Strickland</u>, 466 U.S. at 687-90; <u>Evans</u>, 272 F.3d at 1087; <u>Tierney</u>, 947 F.2d at 868-69. The court further finds that the

decision of the Missouri appellate court in regard to the claim of Petitioner's Ground 11 was based on a reasonable determination of the facts in light of the evidence presented at Petitioner's trial. <u>See</u> § 2254(d)(2). The court finds, therefore, that Petitioner's Ground 11 is without merit and that habeas relief on its basis should be denied.

## VI.
## CONCLUSION

For the reasons stated above, the court finds that Grounds 1-12 of Petitioner's § 2254 Petition and Amended Petition are without merit; that Petitioner has failed to exhaust his administrative remedies in regard to Grounds 15-17; that Petitioner has procedurally defaulted Grounds 12-17; and that, therefore, Petitioner's § 2254 Petition and Amended Petition for habeas relief should be denied in their entirety. The court further finds that Petitioner's Motion to Reconsider should be denied.

The undersigned further finds that the grounds asserted by Petitioner do not give rise to a any issues of constitutional magnitude. Because Petitioner has made no showing of a denial of a constitutional right, Petitioner will not be granted a certificate of appealability in this matter. <u>See</u> <u>Tiedeman v Benson</u>, 122 F.3d 518, 522 (8th Cir. 1997).

Accordingly,

**IT IS HEREBY ORDERED** that the Petition and Amended Petition filed by Petitioner for habeas corpus pursuant to 28 U.S.C. § 2254 are **DENIED**, in their entirely; Doc. 1, Doc. 7, Doc. 11; Doc. 17.

**IT IS FURTHER ORDERED** that a separate judgement will be entered this same date incorporating this Memorandum Opinion;

**IT IS FURTHER ORDERED** that, for the reasons stated herein, any motion by Petitioner for a certificate of Appealability will be **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's Motion to Reconsider is **DENIED**[11]; Doc. 27.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of July, 2009.

---

[11]    Petitioner directed his Motion to Reconsider to the district court judge. In the matter under consideration, however, there is no district court judge.  As such, the court has addressed Petitioner's Motion to Reconsider. Petitioner alleges in the Motion to Reconsider that the court abused its discretion in denying his Motion for Discovery and Motion for Evidentiary Hearing. See Docs. 24, 26.  In support of the Motion to Reconsider Petitioner makes arguments which he previously made to this court and which the court found without merit. As such, the court denies Petitioner's Motion to Reconsider for the reasons stated in its previous Order. See Doc. 26.